UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOSEPH REYNO,

     Plaintiff,

v.                                   Case No.: 6:21-cv-310-MCR

ACTING COMMISSIONER OF
THE SOCIAL SECURITY
ADMINISTRATION,

     Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying his applications for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI"). Following an administrative hearing held on July 21, 2020, the assigned Administrative Law Judge ("ALJ") issued a decision, finding Plaintiff not disabled from September 27, 2017, the alleged disability onset date, to August 20, 2020, the date of the decision. (Tr. 10.) The Court has reviewed the record, briefs, and the applicable law. For the reasons stated herein, the Commissioner's decision is **AFFIRMED**.

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. (Doc. 24.)

## I.   Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must consider both evidence that is favorable and evidence that is unfavorable to the decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.   Discussion

### A. Issues on Appeal

Plaintiff raises two issues on appeal.  First, Plaintiff argues that the ALJ failed to apply the correct legal standards to his testimony regarding pain and limitations.  (Doc. 29 at 9.)  Plaintiff argues that while the ALJ cited to the objective medical evidence, the ALJ failed to discuss or weigh any of the relevant factors listed in 20 C.F.R. § 404.1529(c)(3)(i)-(vii) when evaluating Plaintiff's testimony regarding his pain and limitations.  (*Id*. at 11.)  Second, Plaintiff argues that he is entitled to a legitimate valid hearing before an ALJ who has lawful authority to hear and decide his claim based on valid legal authority.  (*Id*.)  Plaintiff argues that on July 21, 2020, the date of his hearing, there was no validly appointed Commissioner of Social Security because SSA's leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the United States Constitution. (*Id*.)

As to Plaintiff's first issue, Defendant argues that the ALJ properly considered the regulatory factors in evaluating the consistency of Plaintiff's subjective complaints.  (Doc. 32 at 18.)  Defendant further argues that Plaintiff's treatment history and objective medical evidence show that his symptoms were not disabling.  (*Id*. at 20.)  Defendant asserts that:

> In January 2019, he was still having some pain, but he was able to work out at the gym for 30 to 45 minutes.  His doctor advised him to avoid high impact activities and to continue using some type of padding when walking and standing.  This evidence substantially supports the ALJ's finding that Plaintiff was not

totally disabled, as he alleged.

((*Id*. at 21 (internal citations omitted.).)

As to Plaintiff's second issue, Defendant argues:

The Parties agree that 42 U.S.C. §902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause. But without more, that conclusion does not support setting aside an unfavorable SSA disability benefits determination. As the Supreme Court explained in the past in *Collins v. Yellen*, 141 S. Ct. 1761, 1787-89 (2021), even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused him harm. Plaintiff cannot make such a showing.

(*Id*. at 4.)

Defendant further argues that Plaintiff's rehearing request should be denied under the harmless error doctrine, the de facto officer doctrine, the rule of necessity, and broad prudential considerations. (*Id*. at 13.)

## B. Standard for Evaluating Opinion Evidence and Subjective Symptoms

The ALJ is required to consider all the evidence in the record when making a disability determination. *See* C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). With regard to medical opinions, the rules in 20 C.F.R. §§ 404.1520c, 416.920c apply to claims filed on or after March 27, 2017.[2] See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R.

---

[2] The rules in 20 C.F.R. § 404.1527, 416.927 apply to claims filed before March 27, 2017.

4

5844-01, 2017 WL 168819 (Jan. 18, 2017).  Because Plaintiff's claim was filed after March 17, 2017, the Court applies the revised rules and regulations in effect at the time of the ALJ's decision.

Under the revised rules and regulations, the ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from [the claimant's] medical sources."  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  The ALJ will articulate in the administrative decision how persuasive all of the medical opinions are in the case record, 20 C.F.R. § 404.1520c(b), 416.920c(b), but need not articulate how evidence from non-medical sources has been considered, 20 C.F.R. § 404.1520c(d), 416.920c(d).

"When a medical source provides one or more medical opinions," those opinions will be considered "together in a single analysis," using the factors listed in 20 C.F.R. §§ 404.1520c(c)(1), (c)(5), 416.920c(c)(a), (b)(1) through (c)(5) as appropriate.  The ALJ is "not required to articulate how [he/she] considered each medical opinion . . . from one medical source individually."  20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1).

When evaluating the persuasiveness of medical opinions, the most

important factors are supportability[3] and consistency[4].  20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2).  Thus, the ALJ "will explain how [he/she] considered the supportability and consistency factors for a medical source's medical opinions" in the determination or decision but is not required to explain how he/she considered the rest of the factors listed in 20 C.F.R. §§ 404.1520c(c), 416.920c(c).  20 C.F.R. § 404.1520c(b)(2), 416.920c(b)(2).  As explained recently by another court in this District:

> Overall, supportability relates to the extent to which a medical source has articulated support for the medical source's own opinion, while consistency relates to the relationship between a medical source's opinion and other evidence within the record.  In other words, the ALJ's analysis is directed to whether the medical source's opinion *supported* by the source's own records and *consistent* with the other evidence of record—familiar concepts within the framework of social security litigation.

*Cook v. Comm'r of Soc. Sec.*, No. 6:20-cv-1197-RBD-DCI, 2021 WL 1565832, *3 (M.D. Fla. Apr. 6, 2021) (emphasis in original) (report and recommendation adopted by 2021 WL 1565162 (M.D. Fla. Apr. 21, 2021)).  When "two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the record . . . but are not

---

[3] The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions  . . . will be."  20 C.F.R. § 404.1520c(c)(1).

[4] "The more consistent a medical opinion(s)  . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s)  . . . will be."  20 C.F.R. § 404.1520c(c)(2).

exactly the same," the ALJ will articulate how he/she considered the other most persuasive factors listed in 20 C.F.R. §§ 404.1520c(c)(3) through (c)(5), 416.920c(c)(3) through (c)(5), which include a medical source's relationship with the claimant,[5] specialization, and other factors.[6]  20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

When a claimant seeks to establish disability through his own testimony of pain or other subjective symptoms, the Eleventh Circuit's three-part "pain standard" applies.  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam).  "If the ALJ decides not to credit such testimony, he [or she] must articulate explicit and adequate reasons for doing so."  *Id.*

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain.

*Id.*

---

[5] The relationship with the claimant factor combines consideration of the following issues: the length of the treatment relationship, the frequency of the examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship.  20 C.F.R. §§ 404.1520c(c)(3)(i)-(v), 416.920c(c)(3)(i)-(v).

[6] The other factors may include: the medical source's familiarity with the other evidence in the claim; the medical source's understanding of the disability program's policies and evidentiary requirements; and the availability of new evidence that may render a previously issued medical opinion more or less persuasive.  20 C.F.R. §§ 404.1520c(c)(5), 416.920c(c)(5).

Once a claimant established that his subjective symptom is disabling through "objective medical evidence from an acceptable medical source that shows . . . a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms," pursuant to 20 C.F.R. §§ 404.1529(a), 416.929(a), "all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory finding in deciding the issue of disability," Foote, 67 F.3d at 1561.  *See also* SSR 16-3p[7] (stating that after the ALJ finds a medically determinable impairment exists, the ALJ must analyze 'the intensity, persistence, and limiting factors of the individual's symptoms" to determine "the extent to which an individual's symptoms limit his or her ability to perform work-related activities").

As stated in SSR 16-3p:

In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.
. . .
In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been

_____

[7] SSR 16-3p rescinded and superseded SSR 96-7p, effective March 28, 2016, eliminating the use of the term "credibility," and clarifying that "subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p.

considered" or that "the statements about the individual's
symptoms are (or are not) supported or consistent." It is also not
enough for our adjudicators simply to recite the factors described
in the regulations for evaluating symptoms.[8] The determination
or decision must contain specific reasons for the weight given to
the individual's symptoms, be consistent with and supported by
the evidence, and be clearly articulated so the individual and any
subsequent reviewer can assess how the adjudicator evaluated
the individual's symptoms.

. . .

In evaluating an individual's symptoms, our adjudicators will not
assess an individual's overall character or truthfulness in the
manner typically used during an adversarial court litigation. The
focus of the evaluation of an individual's symptoms should not be
to determine whether he or she is a truthful person. Rather, our
adjudicators will focus on whether the evidence establishes a
medically determinable impairment that could reasonably be
expected to produce the individual's symptoms and given the
adjudicator's evaluation of the individual's symptoms, whether
the intensity and persistence of the symptoms limit the
individual's ability to perform work-related activities[.]

SSR 16-p.

"[A]n individual's attempts to seek medical treatment for symptoms

and to follow treatment once it is prescribed" will also be considered "when

evaluating whether symptom intensity and persistence affect the ability to

---

[8] These factors include: (1) a claimant's daily activities; (2) the location,
duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any
precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side
effects of any medication taken to alleviate the claimant's pain or other symptoms;
(5) any treatment, other than medication, received by the claimant to relieve the
pain or other symptoms; (6) any measures (other than treatment) used to relieve the
pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20
minutes every hour, or sleeping on a board); and (7) any other factors concerning
the claimant's functional limitations and restrictions due to pain or other
symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p.

perform work-related activities." *Id.* "[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, [the adjudicator] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." *Id.* However, the adjudicator "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." *Id.* In considering an individual's treatment history, the adjudicator may consider, *inter alia*, one or more of the following:

- That the individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her symptoms;
- That the individual may receive periodic treatment or evaluation for refills of medications because his or her symptoms have reached a plateau;
- That the individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms;
- That the individual may not be able to afford treatment and may not have access to free or low-cost medical services;
- That a medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual;
- That due to various limitations (such as language or mental limitations), the individual may not understand the appropriate treatment for or the need for consistent treatment.

*Id.*

## C. Relevant Evidence and Administrative Findings

### 1.    Halifax Health

Plaintiff was involved in a motor vehicle accident and was hospitalized from September 27, 2017, to October 19, 2017.  (Tr. 352.) Hospital records provide that Plaintiff was the restrained driver in a head-on collision with a vehicle that did not have its head lights on.  (Tr. 355.)  At the time of admission, Plaintiff had deformity to his right thigh, and an open wound on his right ankle with deformity in that region.  (Tr. 360.)  X-ray of the right leg revealed a right femur fracture and X-ray of the right tib-fib revealed a comminuted fracture of the medial malleolus.  (*Id.*)  At the time of discharge, Plaintiff had undergone two orthopedic surgeries, and was waiting for swelling to subside in his right lower extremity/ankle area.  (Tr. 355.)

Upon review of the X-rays, the recommended treatment plan was "reduction and intramedullary nail fixation of right femur with irrigation and debridement and possible open reduction, internal fixation of right ankle and foot."  (Tr. 363.)  On October 3, 2017, Plaintiff underwent an "[i]rrigation and debridement of open right calcaneus fracture, irrigation, debridement of right distal tibia fracture, open reduction and internal fixation medial malleolus fracture."  (Tr. 367.)  Upon discharge, Plaintiff was instructed to not get out of bed or chairs independently, and it was recommended that he use a

11

wheeled walker.  (Tr. 472.)

On October 19, 2017, Plaintiff underwent irrigation and debridement of his right foot, open reduction internal fixation of his right calcaneus, and application of wound VAC dressing.  (Tr. 592.)  On October 26, 2017, Plaintiff underwent irrigation debridement and split-thickness skin graft of his right foot.  (Tr. 594.)  As of October 27, 2017, Plaintiff was performing with less than half of his locomotion effort and required assistance of at least one person when walking.  (Tr. 644.)  As of November 25, 2019, Plaintiff's doctor noted:

> Overall, [Plaintiff] is doing very well with his right ankle subtalar arthrodesis. He does have slight evidence of posterior medical osteoarthritis [in] the tibiotalar joint.  However, this subtalar arthrodesis appears to be completely consolidated . . . I advised [Plaintiff] that there is a chance that he developed fulminant arthritis of the remainder of his ankle.  However, as long as he is doing well and not having any significant discomfort, [he] will continue proceeding forward with normal activity.

(Tr. 896.) Plaintiff also reported doing well and being happy with his overall progress.  (*Id.*)

## 2.    Orthopedic Clinic of Daytona

On April 23, 2018, Plaintiff underwent additional surgery for removal of deep hardware, right subtalar arthrodesis with iliac crest bone graft and lateral wall ostectomy of calcaneus.  (Tr. 665.)  At Plaintiff's post-operative follow-up on May 8, 2018, the surgical incisions were well-healed, there was

12

no evidence of erythema or drainage, and there was minimal swelling with full sensation in his right ankle.  (Tr. 679.)  Plaintiff was instructed to remain non-weightbearing and was placed into a short leg fiberglass cast.  (*Id*.)  At Plaintiff's post-operative follow-up appointment, on June 4, 2018, Plaintiff ambulated with a knee scooter and wore a short leg cast on his right leg.  (Tr. 674.)  Plaintiff also complained of frequent mild to moderate pain, and, at that time, was taking Hydrocodone 10-325[]mg for pain relief.  (*Id*.) Plaintiff's cast fit well, and he reported slow improvement.  (*Id*.)

### 3.    Psychological Assessment

On July 5, 2019, Plaintiff underwent a psychological evaluation with Dr. Diane Ramirez at Flagler Psychological Services.  (Tr. 850.)  In that evaluation, Plaintiff was diagnosed with "major depressive disorder, single episode, moderate."  (Tr. 853.)  Dr. Ramirez's summary of the evaluation is as follows:

> Mr. Reyno is a 44-year-old male who was evaluated at the request of the Social Security Administration's Division of Disability Determination. He presented with depressed feelings including sadness, crying spells, lack of motivation to do much, including sometimes not wanting to complete hygiene rituals, anhedonia and lack of energy.  He was in a serious motor vehicle accident in 2017 and since he is anxious about what might happen to him or his family.  He reports feeling paranoid like someone would hurt them.  He doesn't want to be around people and often isolates himself. His sleep is backwards and he sleeps most of the day and is up all night.  No psychotic symptoms are reported.  He feels hopeless because of the prognosis the doctors gave him and the extreme pain he is in.  He doesn't want pain

medications and doesn't want to be addicted to anything, but he does drink a fair amount of alcohol to help him deal with the pain and depression.

Mr. Reyno appears to meet the criteria for Major Depressive Disorder, single episode, moderate and Alcohol Use Disorder. The presented symptom picture is consistent with the reported conditions. The severity of the symptoms based on observation and client report appears to be moderate. Prognosis is considered to be fair.

(*Id.*)

### 4. Stand-Up MRI & Diagnostic Center

On March 7, 2019, an MRI of Plaintiff's lumbar spine revealed:

At L1-2, there is no evidence of ventral extradural defect or disc herniation present. There is no central canal stenosis or neuroforaminal narrowing present.

At L2-3, there is no evidence of ventral extradural defect or disc herniation present. There is no central stenosis or neuroforaminal narrowing present.

At L3-4, there is no evidence of ventral extradural defect or disc herniation present. There is no central stenosis or neuroforaminal narrowing present

At L4-5, there is broad-based posterior central and left paracentral disc herniation with annular tearing. Disc herniation extends approximately 6.5 mm beyond the disc margin with mild central canal stenosis. The bilateral neuroforamina are within normal limits.

At L5-S1, there is no evidence of ventral extradural defect or disc herniation present. There is no central canal stenosis or neuroforaminal narrowing present.

(Tr. 889.)

On March 14, 2019, an MRI of Plaintiff's cervical spine revealed:

14

At C2-C3, there is no evidence of ventral extradural defect or disc herniation present. There is no central canal stenosis or neuroforaminal narrowing present.

At C3-C4, there is no evidence of ventral extradural defect or disc herniation present. There is no central canal stenosis or neuroforaminal narrowing present.

At C4-C5, there is posteroventral disc herniation with annular tear. There is thecal sac and cord impingement. Disc herniation extends approximately 2[]mm beyond the disc margin. There is mild foraminal stenosis bilaterally.

At C5-C6, there is a bulging annulus which abuts the ventral thecal sac. There is no central canal stenosis or neuroforaminal narrowing present.

At C6-C7, there is no evidence of ventral extradural defect or disc herniation present. There is no central canal stenosis or neuroforaminal narrowing present.

At C7-T1, there is no evidence of ventral extradural defect or disc herniation present. There is no central canal stenosis or neuroforaminal narrowing present.

(Tr. 935.)

### 5. Plaintiff's Hearing Testimony

Plaintiff appeared at the July 21, 2020 hearing before the ALJ. (Tr. 48.) He testified about his limitations, in relevant part, as follows:

> Q    Okay, and you were originally in the hospital for about how long?
> A    It was months off and on, five separate surgeries that went up I believe a two-month period.
> Q    Okay and what was your major [injury]? I know you had a lot of different injuries but what was the main injury that they were focusing on originally?
> A    Main, want to say probably ankle and heel along with

15

edema.  All the bones in my heel and my ankle are basically shattered.

. . .

Q   . . . Okay. You said constant pain. Is that mostly in the right foot or is it your entire right leg?

A   . . . Well, my entire right leg and especially my heel and my ankle when I'm up and moving around. Without even concentrating all my joints, except for my elbows basically, I'm in pain on a constant basis and it just gets worse as I do more or up my routine.

. . .

Q   So how long can you be on your feet? Like how long can you or how far can you walk at one time?

A   I've got about a three-hour window of activities, so if I'm at the gym for 30 minutes, on my stretching or my biking, I mean I can go to Walmart for 30 to 40 minutes and I want to take the kids out for an activity, I'm limited to about an hour or so. But like I say I have about a three-hour window where I can actually get out and do things and after that I'm experiencing pain in the leg and the foot more extreme than normal. The lower back issues like that keep me fatigued and I'm kind of locked down to the social.

Q   Okay, and when you say that you have a three-hour window, just to be clear, do you mean that you can be on your feet walking for three hours or that all together with three hours of activity?

A   Yeah, I would say three hours of activity. Like definitely could not walk for three hours. Just locked in the truck drive . . . to the gym. Drive to the grocery store, maybe walk around there for a little bit. My life right now basically consists of going to the gym, doing a few errands, maybe going to the pool to get my exercise in and I'm—I'm not really—I'm unsocial basically.

Q   Okay, what type of activities and/or what kind of exercise are you able to do at the gym?

A   I do biking. I do a lot of stretching and a lot of the stretching exercises that I learned in physical therapy too.

. . .

Q   Okay, you said you're laying down a lot. Is that like throughout the day or—

A   I basically have my bedroom set up in my living room

16

now and its an easy access point for me to get around the house and I'm basically on my bed lying down when I'm at home.

     Q     Okay. Are you taking any medications for your pain?

     A     I'm not taking any pain medication, far from . . . Ibuprofen.

     Q     Okay. Are you having symptoms like anxiety or depression—or [?]

     A     Yeah, I do have a lot of anxiety and the depression, at first I thought I was just, you know the results of the accident and that's not out of it, but the energy levels and depression seem to keep me, yeah, keep me pretty low since onset.

     Q     Okay. Any difficulty dealing with people like being around other people or interacting with people?

     A     Yeah, that's also a problem. Social gatherings and things are just well, not for me anymore.

     Q     Okay. Any difficulties with like concentration or memory?

     A     Absolutely. I remember short-term things and focusing on different tasks. . .

     Q     Okay. Are you having difficulty doing like basic dressing, bathing, things like that?

     A     As far as dressing myself, I can do that. The bathing is a whole different thing. Used to be able to hop in the shower, get cleaned up out the door and now it's a pretty big ordeal.  I guess – I don't know if it's my leg or my foot but at the end of the day I lost about a quarter of an inch of my right side so everything is a hassle now trying to get in and out of a tub.  It's a lot. It's a lot of work—trying to do basic things that used to be pretty easy.

. . .

     A     I wear a flip flop on my shorter leg and that kind of balances for the left so when I do get it in the shower I can just, you know grab a hold of the bar and lift the flip flop on one leg. It kind of balances me out but I wouldn't—I couldn't get in the tub without the flip flop. I can't even walk around my house on the hardwood floor at all without a shoe or something underneath my foot. . . .

     Q     Okay. And difficulty doing basic chores like cooking, cleaning, things like that?

     A     No, I don't really do them. My wife and kids do a lot. They really help out.

(Tr. 52-58.)

### D. The ALJ's Decision

The ALJ issued his decision on August 20, 2020.  (Tr. 10.)  At step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date. (Tr. 12.)  At step two, he found that Plaintiff's severe impairment was major dysfunction of a joint.  (*Id*.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 14.)  Before step four, the ALJ determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except he can lift and/or carry 10 pounds occasionally, and less than 10 pounds frequently.  The ALJ determined that Plaintiff can sit, with normal breaks, for a total of 6 hours per 8-hour workday, but can only stand and/or walk, even with normal breaks, for a total of just 2 hours in an 8-hour workday.  (*Id*.)

The ALJ summarized some of the pertinent hearing testimony and Plaintiff's allegations as follows:

> The claimant alleges he is disabled and unable to work due to hip, leg, ankle, and heel pain.  He further alleges that his sleep is interrupted and limited to 4 to 6 hours of broken sleep.  He is able to care for his personal ADLs, but it is slower and more difficult than it used to be.  He indicates his medications are aspirin and fish oil.  He is able to drive a car and can go out

18

alone.  He is able to regularly go to the pool, gym, and chiropractor.  The claimant alleges he has difficulty lifting, squatting, bending, standing, reaching, walking, kneeling.  He has trouble getting into and out of a bathtub and trouble with balance.  He wears flip-flops on his shorter leg to balance out their lengths.

(Tr. 15.)

The ALJ found that Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record."  (*Id.*)  The ALJ explained:

Concerning the medical evidence, the claimant was involved in a motor vehicle accident in September 2017, which resulted in fractures to his right hip, thigh, calf, ankle, and heel.  He underwent an open reduction internal fixation of the right ankle and irrigation and debridement of the tibia and calcaneus fractures. Afterwards, he was waiting for the swelling to recede in his right lower extremity and right ankle before a third surgery could take place, he was discharged in October 2017 (Ex. 3F/6-11).  A CT angiogram was negative for vascular injury (Ex. 3F/16).  An examination of the bilateral upper extremities revealed no significant pain with shoulder, elbow, or wrist motion. His sensation was intact in all fingers.  The left leg revealed no obvious pain or deformity with hip, knee, or ankle motion. His skin and sensation were intact.  At follow-up after his discharge, it was discovered that the claimant displayed significant necrosis of his skin at the right calcaneus fracture. Split-thickness skin graft was applied and intravenous antibiotics were administered.  A PICC line was given and the claimant was discharged home on IV antibiotics (Ex. 3F/231). . . .
Over time, he has progressed from being unable to bear weight to weight bearing activities as tolerated, with the use of crutches, a

walking roller, a knee scooter, a fracture boot, and finally normal shoe apparel. During the period, he participated in physical therapy, chiropractic therapy, and a home exercising program. His progress has been good overall, but he is limited in the length of time he can stand without reprieve. Accordingly, I find that the claimant can lift and/or carry 10 pounds occasionally and less than 10 pounds frequently. The claimant can sit, with normal breaks for a total of 6 hours per 8-hour workday, but can only stand and/or walk, even with normal breaks for a total of just 2 hours per 8-hour workday. Although not a severe impairment, because of his complaints of back and neck pain, I find that he can never climb ladders, ropes, or scaffolds, but he can occasionally climb ramps and stairs, balance, kneel, stoop, crouch, and crawl.

At step four, the ALJ found that Plaintiff was unable to perform his past relevant work as a gambling dealer. (Tr. 20.) The ALJ then considered claimant's residual functional capacity, age, education, work experience, and the vocational expert's testimony, and determined at step five that Plaintiff could perform the requirements of general production worker, machine tender, and assembler. (Tr. 21-22.)

### E. Analysis

#### 1. Plaintiff's Challenge to the ALJ's Application of the Correct Legal Standards to Plaintiff's Testimony of His Pain and Limitations

When a claimant attempts to establish a disability through his own testimony about pain or other subjective symptoms, the ALJ must apply a three-part pain standard. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). Under that standard, the claimant must present: "(1) evidence of an

underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) evidence that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Id*.

Here, the ALJ properly applied that standard. Although the ALJ did not cite to *Wilson*, he explicitly mentioned the pain standard and discussed evidence of Plaintiff's underlying medical conditions. The ALJ also discussed the objective medical evidence that Plaintiff presented as to the severity of the pain, but ultimately concluded that evidence did not support a finding that the pain was as severe as Plaintiff claimed. Contrary to Plaintiff's argument that "[t]he ALJ failed to discuss or weigh any of the relevant factors listed in 20 C.F.R. § 404.1529(c)(3)(i)-(vii) when evaluating [Plaintiff's] testimony regarding his pain and limitations," the ALJ did in fact discuss and weigh "at least some" of the factors listed in 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

First, the ALJ properly stated the standards governing his evaluation of Plaintiff's subjective pain testimony. (Tr. 15.) Then, the ALJ discussed Plaintiff's alleged ankle, foot, back, and cognitive symptoms, but concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (*Id*.) The ALJ also discussed Plaintiff's independent daily activities such as showering, dressing, toilet use,

21

getting out of bed, walking, eating, and exercising. (Tr. 18.)  Moreover, in a

clear and chronological order, the ALJ discussed the location, duration, and

intensity of Plaintiff's pain.  (*See generally* Tr. 10-22.)  Throughout his

decision, the ALJ accounted for Plaintiff's allegations of continued foot and

ankle pain, but also cited to Plaintiff's reports of satisfaction with his

progress and objective medical evidence that demonstrated effective

treatment.  (*Id.*)  In one section, the ALJ summarized Plaintiff's surgeries

and overall progression as follows:

> He underwent orthopedic surgeries to repair the fractures and
> debride the wounds. Over time, he has progressed from being
> unable to bear weight to weight bearing activities as tolerated,
> with use of crutches, a walking roller, a knee scooter, a fracture
> boot, and finally normal shoe apparel.  During the period, he
> participated in physical therapy, chiropractic therapy, and a
> home exercising program.  His progress has been good overall,
> but he is limited in the length of time he can stand without
> reprieve.

(*Id.* at 18.)

Thus, the ALJ found that Plaintiff passed through the threshold of the

"pain standard," but rather his testimony about his limitations was not fully

supported by the record.  To that end, there is substantial evidence in the

record that shows Plaintiff's progressive improvement, supporting the ALJ's

decision that Plaintiff was not totally disabled precluding alternative work as

he alleged.  (*See, e.g.*, Tr. 815 (stating, on November 9, 2017, that plaintiff

was ambulating with a walker and was told to continue to be non-

22

weightbearing on the lower right extremity); Tr. 809 (stating, on November

16, 2017, that Plaintiff's pain level was about a "7" and that he reported no

anxiety or depression); Tr. 804 (reporting, on November 27, 2017, that his

ankle/foot pain was worsening, but he was taking Percocet for pain relief,

which was helping to alleviate the pain); Tr. 779 (stating, on May 8, 2018,

that Plaintiff's surgical incisions were well healed with no evidence of

erythema or drainage, and that he had full sensation); Tr. 769 (stating, on

July 5, 2018, examination of right lower extremity reveals no pain with hip or

knee range of motion and that surgical incisions of his ankle were completely

healed); Tr. 765 (stating, on August 16, 2018, that Plaintiff's right ankle was

healing well and that he was encouraged to continue weightbearing as

tolerated and progress to regular shoes or work boots as needed); Tr. 263

(writing in his March 26, 2019 Supplemental Pain Questionnaire that his

condition does not affect sitting); Tr 265 (writing in his June 19, 2019

Supplemental Pain Questionnaire that sitting is not painful); Tr. 276

(Plaintiff writing, on June 19, 2019, that swimming, physical therapy, and

stretching helped to alleviate some of his pain for a few hours); Tr. 896

(advising, on November 25, 2019, that Plaintiff may develop arthritis in his

right ankle but he could proceed with normal activity as long as he was doing

well); Tr. 895 (noting, as of November 25, 2019, the only medications Plaintiff

was taking were aspirin and fish oil); Tr. 54 (stating during the July 21, 2020

23

hearing that his life "basically consists of going to the gym, doing a few errands, [and] maybe going to the pool.").)

Other than the assertion that Plaintiff's treatment was not conservative (Doc. 29 at 11), he has not demonstrated that the ALJ's decision was not supported by substantial evidence. It is undisputed that Plaintiff underwent multiple life-altering surgeries, but this fact alone does not negate the substantial evidence in the record. While Plaintiff does have some limitations in maneuvering throughout his day, the ALJ found, and Plaintiff himself admitted, that his limitations do not affect sitting, and that certain exercises helped to alleviate his pain for a few hours at a time. The ALJ credited Plaintiff's testimony regarding his inability to stand for extended periods of time and adjusted his RFC accordingly. (*See* Tr. 19 (ALJ disagreeing with state agency medical consultant's opinion that Plaintiff could perform work at the light exertional level, and, in light of Plaintiff's pain allegations, reducing his RFC to sedentary); Tr. 21 (ALJ stating that "[Plaintiff's] ability to perform all or substantially all of the requirements of [the full range of sedentary work] has been impeded by additional limitations.).)

Moreover, the effectiveness of Plaintiff's treatment, as outlined above, is evident. Records from various orthopedic visits show significant improvement in Plaintiff's post-operative ankle symptoms, as he went from

24

ambulating with assistive devices to independently ambulating with the use of padding and the doctor encouraging him to wear regular shoes or work boots.  In light of these considerations, the Court finds that ALJ's decision was supported by substantial evidence, and he employed the proper legal standards.

### 2.  Plaintiff's Challenge to the ALJ's Lawful Authority and Actions

Plaintiff argues that his case should be remanded because the removal provision application to the Commissioner, 42 U.S.C. § 902(a)(3), is constitutionally invalid under *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020).  (Doc. 29 at 12-17.)  For her part, the Commissioner "agree[s] that the relevant removal provision violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause."  (Doc. 32 at 4 (internal citations omitted.).)  However, citing a subsequent Supreme Court ruling—*Collins v. Yellen*, 141 S. Ct. 1761 (2021)—the Commissioner contends that Plaintiff is not entitled to a remand because he cannot show that the unconstitutional removal restriction actually caused him harm.  (*Id.*)

In *Seila Law*, the Supreme Court held that the Consumer Financial Protection Bureau's ("CFPB") "leadership by a single individual removable only for inefficiency, neglect, or malfeasance violate[d]" the constitutional

separation of powers doctrine. 140 S. Ct. at 2197. In *Collins*, the Supreme

Court considered whether the "for cause" removal provision applicable to the

head of the Federal Housing Finance Agency ("FHFA") was constitutional.

141 S. Ct. at 1770. Like *Sheila Law*, the Supreme Court in *Collins* held that

the removal provision violated constitutional separation of powers principles

and was therefore unconstitutional. *Id*. at 1787. The Supreme Court did not

resolve whether the party challenging the removal provision was entitled to

relief, but observed that:

> Although an unconstitutional provision is never really part of the
> body of governing law (because the Constitution automatically
> displaces any conflicting statutory provision from the moment of
> the provision's enactment), it is still possible for an
> unconstitutional provision to inflict compensable harm. And the
> possibility that the unconstitutional restriction on the President's
> power to remove a Director of the FHFA could have such an effect
> cannot be ruled out. Suppose, for example, that the President had
> attempted to remove a Director but was prevented from doing so
> by a lower court decision holding that he did not have "cause" for
> removal. Or suppose that the President had made a public
> statement expressing displeasure with actions taken by a
> Director and had asserted that he would remove the Director if
> the statute did not stand in the way. In those situations, the
> statutory provision would clearly cause harm.

*Id*. at 1788-89.

In a concurring opinion, Justice Kagan offered a particularly relevant

observation:

> [T]he majority's approach should help protect agency decisions
> that would never have risen to the President's notice. Consider
> the hundreds of thousands of decisions that the Social Security
> Administration (SSA) makes each year. The SSA has a single

head with for-cause removal protection; so a betting person might wager that the agency's removal provision is next on the chopping block. . .but given the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone. . .When an agency decision would not capture a President's attention, his removal authority could not make a difference—and so no injunction should issue.

*Id*. at 1802 (Kagan, J., concurring in part).

To no surprise, the Commissioner—undoubtedly driven by the need to avoid an institutional quagmire caused by the potential reversal of countless SSA decisions—has listed 29 district court decisions apparently agreeing with Justice Kagan's assessment.  (*See* Doc. 32 at 11 n.2.)  As the Eleventh Circuit has not yet ruled on this precise constitutional challenge, the Court looks to decisions in this District for guidance.

In *Herring v. Comm'r of Soc. Sec.*, the court ruled that the removal provision does not necessitate remand or a rehearing of the plaintiff's claim because (1) the removal provision is severable from the remainder of the Social Security Act, and (2) the plaintiff failed to show how the unconstitutional removal provision harmed him.  *Herring v. Comm'r of Soc. Sec., Defendant.*, No. 2:21-CV-322-MRM, 2022 WL 2128801, at \*6 (M.D. Fla. June 14, 2022); *Perez-Kocher v. Comm'r of Soc. Sec.*, No. 6:20-cv-2357-GKS-EJK, 2021 WL 6334838, at \*4 (M.D. Fla. Nov. 23, 2021) (finding that a plaintiff had failed to state a claim upon which relief could be granted

because the plaintiff could not establish that the Acting Commissioner's unconstitutional tenure protection caused compensable harm).

Here, like the plaintiff in *Herring*, Mr. Reyno has failed to show the removal provision harmed him.  The Court is left guessing which, if any, of the former Commissioner's actions and/or inactions are traced to the ALJ's decision to deny Plaintiff disability benefits.  For example, Plaintiff has not shown that the President was unable to remove Mr. Saul as a result of the alleged unconstitutional tenure, undermining the existence of the nexus between the provision and the unfavorable decision.  Additionally, Plaintiff "fails to show that absent the alleged unconstitutional provision, [Plaintiff's] claim would have been decided differently at either the ALJ or the Appeals Council level." *Herring*, at *5.  Instead, Mr. Reyno simply relies on President Biden's statement made during the former Commissioner's termination.[9] The Court is not at liberty to consider accusations made by the President the regarding the former Commissioner's actions in determining whether Plaintiff is entitled to a new hearing before a different ALJ.

Additionally, Plaintiff attempts to distinguish the plaintiffs in *Collins*

---

[9] Plaintiff quotes from President Biden's declaration in relevant part: "[s]ince taking office, Commissioner Saul has undermined and politicized Social Security disability benefits, . . . reduced due process protections for benefits appeals hearings, and taken other actions that run contrary to the mission of the agency and the President's policy agenda."  (Doc. 29 at 16.)

from this case because, as Plaintiff argues, "[this case] does in fact involve government actors exercising power which those government actors did not lawfully possess." (Doc. 29 at 15.)  But that argument is flawed.  At the time of this decision, the ALJ was properly appointed because "on July 16, 2018, the Acting Commissioner of Social Security ratified the appointments of [the Social Security Administration's] ALJs and approved those appointments as her own." *See* 84 Fed. Reg. 9583 (2019.).  Lastly, in a single sentence citing to *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018), Plaintiff suggests that he is entitled to a "de novo hearing before a new ALJ who does not suffer from the unconstitutional taint of having previously heard and decided this case when the ALJ had no lawful authority to do so." (Doc. 29 at 17.)  Plaintiff improperly conflates the Supreme Court's ruling in *Lucia*  with the decisions in *Collins* and *Seila Law*.  The Court in *Lucia* "held that the appropriate remedy for an adjudication tainted with an appointments violation is a new hearing before a properly appointed official." *Lucia*, 138 S. Ct. at 2055. However, neither *Seila Law*, *Collins*, or the case at hand involved issues with the manner of appointment of the Commissioner or the ALJ that denied Plaintiff's claim. *See Vergara v. Kijakazi*, No. 20-22964-CIV, 2022 WL 769704, at *8 (S.D. Fla. Feb. 23, 2022), *report and recommendation adopted sub nom. Vergara v. Comm'r of Soc. Sec.*, No. 20-22964-CIV, 2022 WL 767125 (S.D. Fla. Mar. 14, 2022), citing *Collins*, 141 S. Ct. at 1788 (explaining that

"[a]ll the officers who headed the FHFA during the time in question were properly appointed[,]" whereas *Lucia* "involved a Government actor's exercise of power that the actor did not lawfully possess).

Thus, because "[t]he Plaintiff failed to demonstrate that the removal provision had any actual or possible impact on the unfavorable decision he received," Plaintiff is not entitled to a new hearing on this issue. *Tucker v. Kijakazi*, No. 21-60943-CIV, 2022 WL 750559, at *13 (S.D. Fla. Feb. 8, 2022), *report and recommendation adopted*, No. 21-60943, 2022 WL 742744 (S.D. Fla. Mar. 11, 2022); *see Tibbets v. Comm'r of Soc. Sec.*, Case No. 2:20-CV-872-SPC-MRM, 2021 WL 6297530, at *6 (M.D. Fla. Dec. 21, 2021) (concluding that the removal provision does not necessitate remand or a rehearing of the plaintiff's claim).)

## III.   Conclusion

The Court does not make independent factual determinations, re-weigh the evidence, or substitute its decision for that of the ALJ.  Thus, the question is not whether the Court would have arrived at the same decision on *de novo* review; rather, the Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence.  Based on this standard of review, the Court concludes that the ALJ's decision that Plaintiff was not disabled within the meaning of the Social Security Act for the time period in question is due to be affirmed.

Accordingly, it is **ORDERED**:

1.  The Commissioner's Decision is **AFFRIMED**.

2.  The Clerk of Court is directed to enter judgment consistent with this Order, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, on July 11, 2022.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record

31